UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | 0:18-cr-00195 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| DENNIS EDWARD BRESNAHAN, | * | SENTENCING MEMORANDUM |
| | * | |
| Defendant. | * | |
| | * | |

## I. INTRODUCTION

On August 13, 2019, this Court sentenced Defendant Dennis Edward Bresnahan to a term

of incarceration of thirty months on Counts One and Two of the Indictment, to be served

concurrently, followed by two years of supervised release.  ECF No. 90.  This memorandum

explicates the Court's analysis and reasoning for this sentence.

On March 1, 2019, Defendant pleaded guilty to two counts of making false statements or

representations to an agency of the United States, in violation of 18 U.S.C. § 1001.  *See* 18

U.S.C. § 3559; ECF Nos. 54, 56.  This Court is now tasked with crafting a sentence that is

"sufficient, but not greater than necessary, . . . (A) to reflect the seriousness of the offense[s], to

promote respect for the law, . . . to provide just punishment for the offense[s]; [and] (B) to afford

adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2).

## II. FACTUAL BACKGROUND

The Defendant is a former U.S. Probation Officer who served the District of Minnesota

for over twenty-five years.  PSR ¶ 7.  In that position, Defendant was responsible for supervising

probationers on federal pretrial and supervised release.  *Id.*  During his employment as a federal

probation officer, Defendant had extensive access to the records of the probationers under his

supervision, including their physical and mental health records, substance abuse histories, employment and financial records, as well as other personal information. *Id.* ¶ 8. Probationers were required to check in with Defendant via phone, e-mail, and in person, and Defendant was authorized to visit them at their workplaces and homes as part of his supervision duties. *Id.*

In August 2016, the Government received sexually explicit recorded phone calls between Defendant and one of his female probationers. *See id.* ¶ 17. The probationer had made the recordings in early April 2016 to prove to her disbelieving defense attorney that Defendant had had sexual phone conversations with her and that he had also requested she send Defendant nude photographs of herself. *Id.* ¶¶ 11, 13–15. Two FBI special agents interviewed Defendant about the phone calls on August 22, 2016. *Id.* ¶ 18. The agents asked Defendant about the probationer, and Defendant admitted he had had "boundary issues and inappropriate conversations" with her. *Id.* He further admitted he had had sexually explicit conversations with her and that he had received a nude photograph of her on his work e-mail. *Id.* Defendant also admitted he had deleted the photograph and failed to report his misconduct or the photograph to his supervisors. *Id.* ¶ 19. However, he refused to admit that he had requested the photograph. *Id.* ¶ 18. And when asked whether he had requested any additional sexual photographs from that probationer or any others, Defendant lied and said he had not. *Id.* ¶ 20.

The two agents thereafter conducted an investigation into whether Defendant had engaged in sexual misconduct with any other probationers and discovered he had. The agents learned Defendant had supervised another female probationer from July 2013 until February 2014, during which time Defendant initiated sexually explicit phone conversations with the probationer. *Id.* ¶ 23–24. In exchange for Defendant's permission to travel out of state, the probationer sent Defendant nude photographs of herself and a sexually explicit video. *Id.* ¶ 24.

The probationer was able to provide the FBI agents with e-mails between herself and Defendant that she had saved and hoped to eventually use to report him. *Id.* ¶ 25. The e-mails intermixed legitimate supervision topics and requirements with sexually explicit topics and photographs. *Id.* ¶¶ 26–36. At some point, Defendant began having phone sex with the probationer. *Id.* ¶ 37. The probationer told the FBI agents she participated in the sexual e-mails and phone conversations and sent Defendant sexually explicit photographs because she feared what he would do to her if she did not comply. *Id.* At the sentencing evidentiary hearing, the probationer testified she initially sent Defendant a random naked photograph she had found online, but because Defendant had access to her personal file, he determined that she was not the subject of the photograph because her tattoos were not pictured; Defendant then asked her to send him new photographs of herself naked. The probationer testified she felt like she had to play along with Defendant's advances because she did not think anyone would believe her and she was worried Defendant could have her sent back to prison. She further testified that, whenever Defendant started sexual conversations via phone, she tried to redirect the conversations into e-mail for written proof of his misconduct.

The agents' investigation also revealed Defendant had not just had sexual conversations with some of his former probationers but also sexual contact. *Id.* ¶ 61. One former probationer who was under Defendant's supervision from 2010 until 2012, informed the agents that on one occasion, Defendant had called her on his way to her home and told her he wanted her to be naked when he arrived; she did not comply. *Id.* ¶¶ 62, 63, 65. After Defendant arrived at her home, he had the probationer sit on his lap while she was on the phone with her sister and later had her perform oral sex on him. *Id.* ¶ 63. The probationer stated she did as Defendant asked because she did not want to go back to prison. *Id.* After the incident, the probationer told her

sister what had happened; both women decided not to report Defendant because they assumed no one would believe them. *Id.* ¶ 64. Four years after the probationer was released from supervision, Defendant utilized the Probation Office's records system to find contact information for her and call her. *Id.* ¶ 66. Upset by his renewed advances, the probationer contacted the Probation Office to file a complaint about Defendant. *Id.* When asked about her complaint, Defendant denied any sexual misconduct. *Id.*

Defendant also had sexual contact with another former probationer whom he had supervised from 1994 until 1997. *Id.* ¶ 68. The probationer told the FBI agents that on at least three occasions, Defendant had come to her place of work and demanded that she perform oral sex on him. *Id.* On another occasion, Defendant went to the probationer's workplace and kissed her and told her to "feel him," meaning his penis. *Id.* Each time after the probationer complied, Defendant threatened her and told her not to tell anyone. *Id.* Defendant also tried to have sexually explicit phone calls with her, telling her he enjoyed the oral sex and wanted more. *Id.* Defendant knew from her file that the probationer had been sexually abused as a child and was raped while serving in the U.S. Air Force. *Id.*

As part of their investigation, the FBI agents found undeleted e-mails of a sexual nature in Defendant's work e-mail account between Defendant and two of his former probationers who had been under his supervision from 2001 until 2003 and 2008 until 2010. *Id.* ¶ 58. One of the e-mails Defendant had sent attached a photograph of an erect penis in open pants and another attached a video of him masturbating at his desk. *Id.* ¶ 60. The FBI agents' investigation also revealed that Defendant had coerced more former probationers into having sexual conversations with him, and that he had sent another photograph of his penis to a female probationer who was not under his supervision, which Defendant had claimed was accidental. *Id.* ¶¶ 70–71.

On August 15, 2018, the Government filed the four-count Indictment in this case. ECF No. 1. Counts One and Two concerned Defendant's false statements to the FBI agents that he had not requested more than one nude photograph from the probationer who initially reported his abuse and that he had not received photographs of a sexual nature from any other former or current probationers. *Id.* at 1–2. Counts Three and Four concerned Defendant's destruction of records by deleting the sexual photographs he had requested and received from current and former probationers. *Id.* at 2–3. Defendant pleaded guilty to Counts One and Two pursuant to a plea agreement. ECF Nos. 54, 56. Counts Three and Four were dismissed at sentencing upon the Government's motion. ECF No. 90.

## III. DISCUSSION

It now falls to this Court to fashion a sentence for Defendant that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). As the Chief Justice of the United States has acknowledged, "[m]ost district judges agree that sentencing is their most difficult duty." Chief Justice John Roberts, *2016 Year-End Report on the Federal Judiciary* 5 (Dec. 31, 2016), https://www.supremecourt.gov/publicinfo/year-end/2016year-endreport.pdf. "The judge must confront the offender, face-to-face, and take just account of human failing. . . . In delivering the sentence, the judge speaks as the voice of the community." *Id.* The important societal function sentencing courts perform is reflected by our laws; Congress has tasked sentencing courts with accomplishing the policy goals articulated in 18 U.S.C. § 3553(a)(2).

Section 3553(a) delineates a number of factors that courts must consider when determining an appropriate sentence. *Id.* Those factors include a number of pragmatic concerns: "the nature and circumstances of the offense"; "the history and characteristics of the defendant"; "the kinds of sentences available"; the U.S. Sentencing Commission's recommended sentence,

expressed through its Sentencing Guidelines, and relevant policy statements; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and "the need to provide restitution to any victims of the offense." § 3553(a)(1), (3)–(7).  The factors also include the aforementioned policy goals: "reflect[ing] the seriousness of the offense, . . . promot[ing] respect for the law,. . . provid[ing] just punishment for the offense; . . . afford[ing] adequate deterrence to criminal conduct; . . . protect[ing] the public from further crimes of the defendant; and . . . provid[ing] the defendant with needed" care, training, or treatment.  *See* § 3553(a)(2).

The Court begins by first determining the applicable advisory Guidelines range before proceeding to the Government's motion for an upward departure or variance and analyzing the § 3553(a) factors.  *See Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see also United States v. Coyle*, 506 F.3d 680 (8th Cir. 2007).

A.  *Advisory U.S. Sentencing Guidelines Range*

The parties agree Defendant's base offense level is six, as calculated in the Presentence Investigation Report (PSR).[1]  U.S. Sentencing Guidelines Manual § 2B1.1 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.].  The Court applies a two-level enhancement for Defendant's Role in the Offense pursuant to U.S.S.G. § 3B1.3 because Defendant abused a position of trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense.  The Court also applies a two-level reduction for Defendant's Acceptance of Responsibility, resulting in a total offense level of six.  *See* U.S.S.G. § 3E1.1(a).  The parties agree Defendant has a criminal history score of zero, establishing a criminal history category of I.  *See* U.S.S.G. §§ 4A1.1, .2(e).  Therefore, the applicable advisory Guidelines range

---

[1] The base offense level of six results by grouping the Counts One and Two together pursuant to §§ 3D1.2(d) and .3(b).

is zero to six months' imprisonment followed by one to three years of supervised release. U.S.S.G. §§ 5A, 5D1.2(a)(2). Based on the total offense level, the minimum applicable fine is $1000 and the maximum is $9500. U.S.S.G. § 5E1.2.

## B. *Departures*

With the Guidelines range determined, the Court now considers the Government's motion for an upward departure. The Government argues the Court should depart upward under U.S.S.G. § 2B1.1, application note 21, and U.S.S.G. § 5K2.0. Application note 21 to § 2B1.1 provides, "There may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense. In such cases, an upward departure may be warranted." U.S.S.G. § 2B1.1 n.21(A). The note includes a non-exhaustive list of factors a court can consider in determining whether to apply an upward departure. *Id.* As the Government correctly points out, § 2B1.1 deals primarily with financial and property crimes, thus the specific offense characteristics relate to financial losses and schemes and hardly account for the physical and psychological suffering that Defendant has inflicted on his former probationers. Therefore, the Government argues, the Court can utilize application note 21 to depart upward based on factors not contemplated elsewhere in § 2B1.1, such as Defendant's repeated sexual harassment and assault of multiple women under his supervision throughout his career as a federal probation officer.

The Government also contends the Court is permitted under cross-reference § 2B1.1(c)(3) to look to § 2J1.2 (Obstruction of Justice) under the Guidelines because Defendant was also charged with two counts of destruction of records under 18 U.S.C. § 1519 for deleting e-mails containing the nude photographs, although he did not plead guilty to those charges.

Section 2B1.1(c)(3) provides,

> If (A) neither subdivision (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (*e.g.*, 18 U.S.C. § 1001 . . . ); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guidelines in Chapter Two (Offense Conduct) apply that other guideline.

U.S.S.G. § 2B1.1(c)(3).  The Government argues that if Defendant's Guidelines range was calculated under § J1.2, Defendant would have a Guidelines range of twenty-one to twenty-seven months' imprisonment and the Court can use this calculation to justify an upward departure.

Next, the Government contends the Court should consider an upward departure under U.S.S.G. § 5K2.0 because Defendant's conduct in this case is outside the "heartland" of typical false statements cases.  ECF No. 77 at 19 (citing *United States v. Never Misses A Shot*, 715 F.3d 1048, 1052 (8th Cir. 2013)).  Section 5K2.0(a)(2)(B) provides, "A departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence."  The Government argues several policy statements apply in this case, including § 5K2.8 (Extreme Conduct), § 5K2.9 (Criminal Purpose), and § 5K2.21 (Dismissed and Uncharged Conduct).  Section 5K2.8 permits a court to "increase the sentence above the guideline range to reflect the nature of the conduct," if it "was unusually heinous, cruel, brutal, or degrading to the victim."  Section 5K2.9 allows a court to increase a defendant's sentence "[i]f the defendant committed the offense in order to facilitate or conceal the commission of another offense."  Section 5K2.21 permits a court to "depart upward to reflect the actual seriousness of the offense based on conduct" that has either been dismissed or not charged pursuant to a plea agreement or otherwise did not factor into the Guidelines calculation.

The Government argues the Guidelines range substantially understates the seriousness of the offense in this case. It asserts Defendant's conduct in this case was "unusually degrading or humiliating within the realm of § 1001 crimes" because the women involved were charged or convicted felons who believed they had no choice but to send sexually explicit photographs to Defendant because they feared what he would do if they did not comply. ECF No. 77 at 20. The Government also contends this case is outside the norm because Defendant lied not just "to cover up . . . aspects of his crime, but . . . to conceal his sexual misconduct against other probationers." *Id.* at 23. These lies about Defendant's underlying conduct, the Government argues, were simply not contemplated by the Sentencing Commission. The Government relies on *United States v. Richart*, 662 F.3d 1037, 1048 (8th Cir. 2011), noting that there, the Eighth Circuit approved the district court's imposition of an upward departure based, in part, on § 5K2.9 because the defendant had lied to cover up the fact that she had murdered her niece. In *Richart*, the court of appeals noted that the case "differ[ed] significantly from the norm" because it did not involve "someone who is lying to a federal agent about whether he paid a tax or wrote a check," but rather, "it's about lying to a federal agent about what happened to a child when the person lying murdered the child." 662 F.3d at 1048 (quoting the district court). The court of appeals further observed that the defendant's lie covering up the brutal murder allowed her to avoid detection and potentially allowed her to ultimately be convicted of a less-serious offense. Similarly, here, the Government contends Defendant lied to the FBI agents about potential sexual crimes he committed and his lie inhibited the agents in their investigation into the matter causing delay. Additionally, the Government contends the Court should depart upward because Defendant further attempted to conceal what he had done by deleting the nude photographs he had received

from former probationers and failing to report the photographs and his misconduct to his supervisors.

The Government also argues that application of § 5K2.8 helps to account for being unable to apply the § 3A1.1 vulnerable victim enhancement in this case. ECF No. 77 at 21 (citing *United States v. Peterson*, 887 F.3d 343, 349 (8th Cir. 2018) (observing the district court found the probation officer who engaged in inappropriate sex acts with female probationers was 'taking advantage of *especially vulnerable* women placed under his supervision" (emphasis added))). Further, the Government urges the Court to depart upward based on unidentified circumstances, namely corruption. The Government acknowledges that Defendant's Guidelines range reflects an enhancement for an abuse of position of trust, but contends the two-level enhancement is insufficient to account for his level of abuse of trust to the FBI agents, to the women he supervised, to society in general, and to the court he served. In sum, the Government argues that, because the Guidelines range in this case accounts only for Defendant's lies, and does not account for the underlying circumstances of Defendant's victimization of multiple vulnerable women over a long period of time, the Court must grant an upward departure to "reflect the scope and impact of his conduct." ECF No. 77 at 27.

Defendant responds generally that there is no basis for the Court to depart upward because his misconduct with the probationers under his supervision was never criminally charged and the relevant offense conduct is limited to his making false statements to the FBI agents during his interview on August 22, 2016. Thus, he contends, because his false statements were "within the heartland of false statement cases," ECF No. 79 at 2, the Court should not grant the Government's motion for an upward departure.

The Court notes that departures under the Guidelines play a smaller role since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245 (2005), in which it held the Guidelines are advisory rather than mandatory. That is not to say that departures under the Guidelines play no role or are unnecessary; but they are narrower and apply in more limited circumstances compared to the broader application of the § 3553(a) factors. *See United States v. Solis-Bermudez*, 501 F.3d 882, 886 (8th Cir. 2007) ("[T]he standards justifying departures under the advisory Guidelines are narrower than the factors enumerated in § 3553(a) . . . ."). In a case such as this, when consideration of the § 3553(a) factors necessarily involves consideration of the factors that may warrant an upward departure, it is "immaterial" whether a district court "impose[s] a sentence above the advisory guideline range" utilizing an upward departure or an upward variance so long as the Court "appropriately consider[s] and explain[s] the relevant § 3553(a) factors." *Richart*, 662 F.3d at 1048. Thus, although an upward departure may be warranted in this case, the Court declines to depart from the advisory Guidelines range because an upward variance based upon § 3553(a) factors discussed below adequately addresses the aggravating factors present here.[2] *See United States v. Jones*, 509 F.3d 911, 915 (8th Cir. 2007).

C. *The § 3553(a) Factors*

The Court now considers the factors of 18 U.S.C. § 3553(a) to craft the appropriate sentence. Defendant has asked the Court to sentence him to a Guidelines range sentence of two years of probation plus community service. The Government has filed a motion for an upward variance from the Guidelines range of zero to six months, seeking a total sentence of forty-eight months. After carefully considering the § 3553(a) factors, the Court concludes neither party's suggested sentence achieves the goals of sentencing.

---

[2] The Court notes its sentence would be the same in this case whether it were to depart or vary upward.

A number of the § 3553(a) factors are easily evaluated while others require a more careful analysis. To begin, the Court acknowledges three kinds of sentences are available: imprisonment, probation, or community or home confinement. *See id.* §§ 3553(a)(3), 3561(a), 3581(a). The position of the U.S. Sentencing Commission has been fully considered by calculation of the applicable Guidelines range and consideration of the policies described therein. *See* 18 U.S.C. § 3553(a)(4)–(5). Further, although the Court rejects the notion that there are no victims of Defendant's conduct, restitution is not a consideration in this case. *See id.* § 3553(a)(7). Defendant has no prior criminal history; thus, there is no apparent need to protect the public from his future crimes. *See id.* § 3553(a)(2)(C). He has no substance abuse history and is in relatively good physical health. Additionally, although Defendant has struggled with depression and anxiety for a long time, he is now on medication for treatment and is stable. He is college educated and employable. Thus, the Court finds Defendant is not in need of "educational or vocational training, medical care, or other correctional treatment." *See id.* § 3553(a)(2)(D). The remaining § 3553(a) factors require a more exacting examination.

1. *The Nature, Circumstances, and Seriousness of the Offenses*

Congress has directed sentencing courts to consider "the nature and circumstances of the offense[s]" and that the sentence imposed "reflect the seriousness of offense[s]." *Id.* § 3553(a)(1), (a)(2)(A). The nature of the offenses of conviction is serious and the circumstances underlying the offense are loathsome and appalling. The Court recognizes that Defendant has pleaded guilty to the offenses of making false statements to FBI agents, and that he is not being sentenced for sexually harassing and assaulting these women. Instead, he is being sentenced for lying about the extent of his misconduct.

The conduct that Defendant tried to conceal with his lies is more than "inappropriate behavior"—as he refers to it. ECF No. 75 at 7. Defendant sexually exploited multiple women throughout his career as a federal probation officer. He groomed the women, starting by initiating sexual conversations with them before moving on to requesting nude photographs and sexual favors from them. When the women complied out of fear, he responded by saying how much he enjoyed the photographs and asking his victims to send more. Defendant used his position to visit their homes and their workplaces under the pretense that he was performing his duties as a probation officer, but in reality he used these opportunities to coerce the women into having sexual relations with him. Defendant also took lewd photographs and a video of himself masturbating at his desk in the federal courthouse and brazenly used his work phone and e-mail to send these images to his victims. These actions occurred while Defendant passed himself off to those he worked with as a dedicated public servant serving with integrity.

Defendant had near unlimited access to these women. He had access to their personal records concerning their physical and mental health, addictions, finances, and histories of past sexual abuse—which he used to revictimize the women. He took advantage of their status as charged or convicted felons, knowing that his word would be believed over theirs. He used this knowledge and his authority against his victims, threatening them that if they told anyone what he had done, he would make sure they would be sent back to prison or even killed. One woman believed she had finally rid herself of Defendant and his abuses when her term of supervised release ended, only to have him wrongfully access her information from the Probation Office's records in order to contact her years later. No longer under his control, the woman finally decided she had had enough and contacted the Probation Office to report his misconduct and demand that he stop contacting her. Defendant denied any misconduct and later contacted a

different victim the same day to tell her to hold off on sending him the naked photographs he had requested from her—not because he regretted his actions or felt remorse for what he had done, but because he was afraid someone might find out and put an end to what he was doing. When confronted with her complaint, Defendant did not admit then that what he had done was wrong, but instead blamed the victim—falsely claiming she was retaliating against him for rejecting her advances.

Defendant attempted to conceal his conduct by deleting e-mails containing the nude photographs he had requested from his victims. His egregious conduct only came to light when one brave woman finally recorded his sexual phone calls with her to prove to her attorney—who had previously laughed in her face when she told him what Defendant had done—that she was telling the truth. It is truly unfortunate that these women were not able to come forward sooner—and that they were not initially believed when they finally did—both because then Defendant might have been prosecuted for the sex crimes he has potentially committed and also because the women's coerced silence enabled him to assault other probationers.

The PSR states there are "no identifiable victims in this offense." The Court recognizes this language is used in an idiosyncratic legal context related to restitution, but the Court is also compelled to explicitly acknowledge that in a broader sense, there are many identifiable victims in this case. Each of the probationers that Defendant harassed and assaulted are his victims. And the general public has also suffered an incalculable intangible harm.

This was not a single incident nor did it involve only one probationer. Defendant perpetrated humiliating sexual abuse on multiple women throughout his career. The Court does not know how many probationers Defendant actually victimized during his career—no one may ever know—but every one of his victims was one too many. The Prison Rape Elimination Act of

2003, 34 U.S.C. §§ 30301–30309, does not apply in non-custodial settings such as community

supervision. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed.

Reg. 37,106-01, 37113 (June 20, 2012) (codified at 28 C.F.R. pt. 115). But it is difficult to

believe that a probationer is any less vulnerable at the hands of her probation officer or any more

able to consent to sexual contact given the power dynamics and control a probation officer exerts

over those he supervises. A probation officer tasked with supervising a probationer after she has

been released from prison is charged with helping her reenter society and aiding in her

rehabilitation. Defendant did the exact opposite by abusing the resources and authority of our

justice system to prey on vulnerable women under his supervision. This case exemplifies public

corruption and disrespect for the law. *See* Zephyr Teachout, Op-Ed., *Legalized Bribery*, N.Y.

Times, Jan. 26, 2015, at A21 ("Corruption exists when institutions and officials charged with

serving the public serve their own ends.").

The Guidelines certainly account for the possibility that someone might lie to an

investigator in order to hide potentially criminal conduct, but the Court is not convinced they

account for the seriousness of the offense in this particular case and the underlying nature and

circumstances. A typical case involving false statements made to a government agency does not

involve a career probation officer lying to cover up his sexual abuse of probationers. Not only

did Defendant inflict unimaginable pain on these women who will likely spend their lives trying

to overcome it, but he repeatedly and flagrantly violated public trust and has exacted untold harm

to the public perception of the criminal justice system. His actions cause the public to call into

question every probation officer's interactions with his or her probationers. Our probation

officers are the necessary intermediaries between the judicial system and probationers. The

Court must have confidence that its officers can be trusted. Defendant's actions have painfully

shaken that confidence and demeaned the integrity and work ethic of the many public servants in his office and probation offices across the country.

It is true that Defendant readily admitted he had had "boundary issues and inappropriate conversations" with one of his probationers and that he held a position of power over them when interviewed by the FBI agents. But he failed to admit that he had requested the nude photograph one of his victims had sent him and outright lied to the agents when he told them he had not requested that the probationer send him any more nude photographs and denied that there was a pattern of this conduct with other probationers. His lies were aimed at preventing the officers from discovering that he had physically and emotionally harmed many more women.

Thus, these factors support the Court's decision to vary upward from the calculated Guidelines range.

### 2. *History and Characteristics of Defendant*

The Court is also required to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Defendant is a fifty-six-year-old former federal probation officer. He is a native of St. Paul and has lived and worked in the area for most of his life. He comes from a large family. His parents had a long and healthy marriage, and Defendant had a good relationship with them and a seemingly happy childhood. Although his parents have passed away, Defendant has a good social support system comprised of his siblings and friends. Defendant has one daughter with whom he unfortunately does not have a relationship and an adopted son. He has no prior arrests or criminal convictions. He was permitted to retire from his position as a U.S. Probation Officer and collect his pension. Since his release pending sentencing, Defendant has obtained new employment as a Vocational Manager at a residential facility designed to help treat adolescent boys' unhealthy sexual behaviors. Defendant appears to

be a dedicated brother and uncle and has volunteered in the community as a football coach for many years.

      3.  *Deterring Criminal Conduct and Promoting Respect for the Law*

Congress has further directed sentencing courts to consider "the need for the sentence imposed . . . to promote respect for the law, and . . . to afford adequate deterrence to criminal conduct." *Id.* § 3553(a)(2)(A)–(B). These considerations are of particular importance in this case. It must be made plain to probation officers across the nation and to the public that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government. When a corrupt officer receives too lenient a sentence, the public understandably loses confidence in the integrity of its system of justice. And it sends a signal to other officers and public servants that they too can harm others for the sole purpose of serving their own ends.

In addition to promoting respect for the law and deterring individuals in positions of power and authority—especially over individuals who have no means of protecting themselves—from engaging in corrupt behavior, strict sentences also serve to protect the public from further harm. Through his actions, Defendant has demeaned the integrity and work ethic of the many probation officers in his office who strive each day to serve the court and those under their supervision. And he has damaged the trust held by the public, his office, the court, his community, his friends and family, and the women he supervised.

Given the risk of future harm to the public if corruption—such as that committed by Defendant—is not stymied, the Court concludes a term of imprisonment must be imposed to engender respect for our laws and to deter others from engaging in similar conduct.

### 3. *Avoiding Unwarranted Sentence Disparities*

Another factor Congress has instructed sentencing courts to consider in crafting appropriate sentences is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). According to the U.S. Sentencing Commission statistics for Fiscal Year 2018, in the District of Minnesota seventy-eight percent of defendants convicted of administration of justice offenses received a sentence of imprisonment. The average length of sentence within the District of Minnesota was 103 months' imprisonment.

In a similar case involving a federal probation officer who sexually assaulted women he was supervising, the defendant pleaded guilty to five counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242, one of which was enhanced because it involved an act of aggravated sexual abuse as defined in 18 U.S.C. § 2241. *See United States v. Walker*, No. 3:10-cr-00298-RRB (D. Or. July 18, 2011) (Judgment & Commitment). Pursuant to a binding plea agreement, the court sentenced the defendant to a total term of 120 months' imprisonment. *Id.*

Based upon the sentencing statistics for the District of Minnesota and the sentence imposed in a similar criminal case, the Court concludes sentencing Defendant to a term of probation plus community service would create unwarranted disparity amongst defendants with similar records found guilty of similar conduct.

### 4. *Just Punishment for the Offense*

As the above-discussed considerations coalesce, the Court must make a final determination of the sentence that is "sufficient, but not greater than necessary, . . . to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). In the Court's judgment, a term of

incarceration is required to reflect the seriousness of the offense, to promote respect for the law, and to deter other officers from engaging in similar misconduct.

Defendant has provided several letters of support, and as one of the letter writers and his counsel have noted, he should not be judged solely by these offenses but by the entirety of his body of work. Indeed, these convictions should not define his "body of work" during his lengthy career as a state and federal probation officer; he has undoubtedly done good work during that time. The Court does not mean to lecture Defendant about morals or suggest that it is morally superior. *See* Hon. Richard S. Arnold, Judge of the United States Court of Appeals for the Eighth Circuit, The Art of Judging: Remarks Before the Judicial Conference of the Eighth Circuit at Duluth, Minn. (Aug. 8, 2002). Defendant is a human being, who has family and friends whom he loves and who love him. But Congress's prescribed punishment of imprisonment of "not more than [five] years" for a § 1001 offense, ten years in this case, cannot be ignored nor should it be.

Defendant seeks leniency based on the destruction of his marriage, the termination of his career, his new lifetime status as a felon, and the public tarnishing of his reputation as a result of the present charges and the sexual misconduct allegations coming to light. However, the collateral consequences of his conviction do not afford Defendant any leniency in this sentencing. *See United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *see also United States v. Morgan*, 635 F. App'x 423, 446 (10th Cir. 2015) ("None of these collateral consequences are properly included in [the] sentence. They

impermissibly favor criminals . . . with privileged backgrounds.").[3]  Defendant's incarceration is a natural and foreseeable result of the kind of conduct in which he engaged.

The Court concludes thirty months' incarceration is a "just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

## IV.  CONCLUSION

The Court has fully considered the advisory Guidelines range, each of the § 3553(a) factors, and the unique circumstances of this case.  The Court finds the Guidelines range in this case is utterly insufficient to account for the circumstances of Defendant's offenses and to accomplish § 3553(a)'s sentencing objectives.  In the Court's judgment, a Guidelines sentence in this case would not reflect the need to deter others and would undervalue the corruption of Defendant's position as a U.S. Probation Officer.  A sentence of probation would in no way "reflect the seriousness" of Defendant's offenses and his conduct.  When it comes to public corruption, the community requires that real, tangible, and severe consequences meet those who hold a position of public trust and then abuse that trust for personal gain.

Accordingly, it is the judgment of this Court that Defendant be sentenced to a term of imprisonment of thirty months to be followed by a two-year term of supervised release.  The Court imposes $200 in mandatory special assessments for the Crime Victims Fund and no fine. This sentence is sufficient, but not greater than necessary, and satisfies the statutory purpose of sentencing.  It is punishment Defendant deserves, it promotes respect for the law, and it serves to

---

[3] The Court is cognizant of the fact that there is disagreement amongst the Circuit Courts of Appeals as to whether consideration of collateral consequences is impermissible or discretionary. *Compare Prosperi*, 686 F.3d at 47 (concluding consideration of collateral consequences is proscribed), *with United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (concluding consideration of collateral consequences was proper in crafting a just sentence).  Neither the U.S. Supreme Court nor the Eighth Circuit has decided the issue.  Regardless, the Court concludes that even if their consideration is proper, the collateral consequences suffered by Defendant are not so onerous relative to his conduct that his sentence should be lessened.

send a message to deter the other 5892 U.S. Probation Officers and many more state probation officers from participating in similar, reprehensible misconduct.

Dated this 21st day of August, 2019.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT